528 F.Supp.2d 303 (2007)
In re METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION.
This document relates to:
Tonneson, et al.
v.
Sunoco, Inc., et al., 03 Civ. 8284
Basso, et al.
v.
Sunoco, Inc., et al., 03 Civ. 9050.
Master File No. 1:00-1898. MDL No. 1358 (SAS).
No. M21-88.
United States District Court, S.D. New York.
November 29, 2007.
*304 *305 Robin Greenwald, Esq., Robert Gordon, Esq., Weitz & Luxenberg, P.C., New York, NY, for Plaintiffs.
Michael D. Axline, Esq., Tracey L. O'Reilly, Esq., Miller, Axline & Sawyer, Sacramento, CA, John A. Sarcone III, Esq., The Sarcone Law Firm, White Plains, NY, for Plaintiffs.
Peter Hoffman, Esq., Katonah, NY, for Plaintiff Quattrochi.
Peter John Sacripanti, E sq., James A. Pardo, Esq., McDermott Will & Emery LLP, New York, NY, for Defendants and Counsel for ExxonMobil and on Behalf of Sunoco, Inc. and Sunoco, Inc. (R & M).
Daniel Krainin, Esq., Beveridge & Diamond, New York, NY, for Defendant Sunoco, Inc.

OPINION AND ORDER
SHIRA A. SCHEINDLIN, District Judge.
I. INTRODUCTION
The plaintiffs in these cases, residents and business owners in the hamlet of Fort Montgomery, New York, live in the vicinity of two gasoline stations found or suspected to have leaked gasoline into the soil. After water from plaintiffs' private wells tested positive for contamination with methyl tertiary butyl ether ("MTBE"), a chemical compound that certain companies began adding to gasoline in 1979,[1] plaintiffs brought these actions against the gas station owners and suppliers. Plaintiffs claim that the MTBE contamination has lowered their property values, and their exposure to the contaminated water has caused them to fear that they or their family members will develop cancer or sustain other ill-health effects in the future.
Plaintiffs bring claims against the defendants for strict product liability, negligence, trespass, nuisance, intentional interference with the right to appropriate water resources, unfair competition under New York General Business Law, outrageous conduct causing the infliction of emotional distress, and violation of Article Twelve of the New York State Navigation Law under negligence, strict liability, and nuisance theories. In their negligence claim, plaintiffs seek relief for the negligent infliction of emotional distress as well as for the lost value of their property and lost income from commercial properties. Defendants *306 now move for summary judgment on the emotional distress claims. For the reasons set out below, defendants' motion is granted in part and denied in part.
II. BACKGROUND
In 2000, testing revealed MTBE contamination in nearly fifty private residential wells in the hamlet of Fort Montgomery, New York. State and private investigations of the contamination centered around two gas stations near route 9W that runs through the small town as potential sources: a Sunoco station and a privately owned Mobil station. Plaintiffs' claims arise out of this series of events.
A. MTBE as a Gasoline Additive
Oil companies including Sunoco and ExxonMobil began discussing the widespread use of MTBE as a gasoline additive in the 1980's.[2] At that time, officials within the companies warned that because MTBE dissolved easily in water and was less likely to bind to soil than other gasoline components, it could migrate quickly and pose groundwater contamination problems in case of spills.[3]
The health effects of MTBE remain in dispute today, and it is unclear on the record in these cases what defendants knew when they began to use MTBE in their gasoline. Several animal studies have shown that rats develop tumors and lesions after ingesting or inhaling MTBE;[4] other studies purport to refute those results, or to show that any carcinogenicity in rats is not relevant to human carcinogenicity.[5]
B. MTBE Releases From the Sunoco Station
In October 1999, Sunoco removed an old underground fuel storage tank from its Fort Montgomery gas station and discovered certain petroleum contaminants in the soil and groundwater surrounding the tank.[6] Due to the presence of the contaminants, the New York State Department of Environmental Conservation (NYSDEC) requested that Sunoco perform further environmental assessment of the site and in the Spring of, 2000, engineers detected MTBE in a well on the Sunoco station property.[7] Engineers also analyzed data from a prior site assessment in 1994 and found that low levels of MTBE had been present at that time in a monitoring well on the station's property.[8] Sunoco's gasoline lines and tanks tested "tight" for leaks *307 immediately after MTBE was detected in 2000,[9] although the gasoline delivery system may have leaked at other times.[10]
After detecting MTBE in the station well, Sunoco's consultants tested residential wells in the surrounding area, revealing MTBE concentrations in forty-one potable wells.[11] In response to the testing results, Sunoco provided residents of the affected homes with bottled water and water treatment systems.[12] The NYSDEC required Sunoco to initiate a subsurface investigation to "delineate both soil and groundwater contamination,"[13] and later approved Sunoco's Remedial Action Plan for the station and a Residential Well Management Plan to monitor water contamination as part of an Order of Consent with the. Department.[14] The Sunoco station closed in October 2002.[15]
C. MTBE Releases From the Mobil Station
ExxonMobil delivered gasoline to the Mobil station in Fort Montgomery from 1995 to 2001, but the station was independently owned by Leroy Favre under a franchise agreement.[16] In the course of an NYSDEC investigation to determine the source of MTBE in groundwater in the station's vicinity, MTBE was detected in a well at the Mobil station.[17]
The NYSDEC did not consider the ExxonMobil corporation as a potentially responsible party for residential well contamination.[18] Its report, however, concluded that the Mobil station "may have historically contributed to soil and/or groundwater contamination. . . . Furthermore . . . concentrations of MTBE present in the shallow overburden has migrated to the deeper, bedrock aquifer. This migration appears to be responsible for historical impacts to the residential potable wells in the immediate vicinity of the station."[19] ExxonMobil was the exclusive supplier of gasoline to the Fort Montgomery station and under the franchise agreement it routinely sent its inspectors to the *308 station to check for leaks.[20]
D. Well Contamination and Plaintiffs' Exposure
A number of homes that obtain water from private wells are located within a quarter of a mile of the Sunoco station, and in close proximity to the Mobil station.[21] Initial testing of residential wells near the Sunoco station in 2000 revealed MTBE at concentrations ranging from 1.0 to 230 parts per billion (ppb), with most levels found at that time falling below the NYSDEC standard for drinking water of 10 ppb.[22] Residential wells between the Mobil station and a residence 200 feet southeast of the station all have had detections of MTBE between 2000 and 2002 as well, with high levels found in some homes, including the residences of Donna Boyce and Anna and Thomas Burley directly across the street from the station.[23]
After initial MTBE detections, Sunoco provided bottled water to the affected homes and installed water treatment systems in certain wells, as directed by the NYSDE C.[24] It is unclear from the record whether Sunoco continues to provide bottled water today, or how many of plaintiffs' wells have treatment systems installed.
E. Emotional Distress
Plaintiffs allege that because they drank, bathed in, and otherwise were exposed to water containing MTBE, they fear that they and their family members may be at higher risk of developing cancer and other health problems. Two of the plaintiffs Donna Boyce and Edwina Geetestified in depositions that their worry causes them to suffer physical symptoms.[25] Boyce, who lives directly across the road from the Mobil Station,[26] states that her anxiety about ingesting MTBE has caused her to suffer migraines and some insomnia.[27] Gee also states that she has suffered insomnia due to her distress about MTBE contamination.[28] Another plaintiff, Joan Buchholz, alleges that exposure to MTBE "affected her immune system and caused her disease of melanoma."[29] A number of other plaintiffs testified in depositions that they worry about their children's and grandchildren's exposure to MTBE.[30]
III. LEGAL STANDARD
Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[31] *309 An issue of fact is genuine "`if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[32] A fact is material when it "`might affect the outcome of the suit under the governing law.'"[33]
The party moving for summary judgment bears the burden of showing the absence of any factual dispute.[34] In turn, to defeat summary judgment, the nonmoving party must raise an issue of material fact by putting forth "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial."[35] a The non-moving party "`may not rely on conclusory allegations or unsubstantiated speculation.'"[36] When deciding a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party.[37] "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment is inappropriate.[38]
IV. APPLICABLE LAW
"Freedom from mental disturbance is [ ] a protected interest" in New York.[39] For most of common law history only physical injury was compensable in negligence or intentional torts, with "parasitic" damages available for emotional distress suffered as a consequence of physical injury.[40] During the twentieth century, the law of New York developed to allow recovery for purely mental suffering absent physical harm under negligence and intentional tort theories.[41] Plaintiffs may now assert a negligence claim where the only harm is emotional distress, and may also assert an independent tort for intentional infliction of emotional distress. Each claim involves different elements.
A. Negligent Infliction of Emotional Distress
Plaintiffs may recover for emotional distress caused when the defendant breaches a duty owed to the plaintiff and "either unreasonably endangers a plaintiff s physical safety or causes the plaintiff to fear for his or her own safety.[42] "Physical injury is not a necessary component of a cause of action for negligent infliction of emotional distress."[43] Courts *310 remain concerned, however, that unlike physical injury, emotional injury is difficult to verify objectively, and therefore have limited the scenarios under which plaintiffs can recover for emotional distress to those presenting some guarantee of the claim's "genuineness."[44] Often the "index of reliability" of the mental suffering is in the form of "contemporaneous or consequential physical harm."[45]
The New York Court of Appeals first allowed recovery for "purely mental suffering" in Ferrara v. Galluchio.[46] Ferrara claimed that she feared she would develop cancer after negligently administered X-rays caused a burn on her shoulder that blistered and scarred.[47] When the blisters and scarring persisted, she consulted a dermatologist who diagnosed the condition as chronic radiodermatitis and "advised the plaintiff to have her shoulder checked every six months inasmuch as the area of the burn might become cancerous."[48] The court considered the danger of fictitious claims for mental injury and the difficulty of proof, but reasoned that in meritorious cases medical proof or other evidence would "corroborate the claim," and courts could weed out spurious claims by "look[ing] for some guarantee of genuineness in the circumstances of the case."[49] The court allowed recovery in Ferrara because the plaintiff's x-ray burn, the advice by her dermatologist that the wound might become cancerous, and the "common knowledge that wounds which do not heal properly over long periods of time frequently become cancerous" made it "entirely plausible . . . that plaintiff would undergo exceptional mental suffering."[50]
Following Ferrara, New York courts allowed recovery for mental suffering in a variety of circumstances in a line of cases establishing what is now known as the "direct duty" theory of recovery.[51] Plaintiffs stated claims for mental suffering after defendants negligently failed to secure the plaintiff's seatbelt in a ski lift,[52] gave the plaintiff false information that her mother had died,[53] and failed to search for and recover plaintiffs daughter's body after the daughter was missing from the hospital,[54] even though there was "no contemporaneous physical harm to provide an index of reliability."[55] These cases are seen as exceptions to the general rule requiring some objective evidence of the distress *311 suffered, because they involve special circumstances guaranteeing that the plaintiffs' distress was genuine.
B. Negligent Infliction of Emotional Distress Due to Toxic Exposure
Ferrara was also the first in a line of cases in which plaintiffs who claimed they were negligently exposed to toxic substances or other disease-causing agents sought recovery solely for the fear that they could develop disease in the future. As more plaintiffs alleged fear based on exposure to industrial substances such as asbestos and PCBs, rather than from a single incident of negligence as in Ferrara, courts established a standard to guarantee the genuineness of exposure claims.[56] "Mere exposure to a toxic substance, without more, is insufficient."[57] To maintain a cause of action for emotional distress caused by exposure to a toxic substance, a plaintiff must establish "both that he or she was in fact exposed to a disease-causing agent and that there is a rational basis' for his or her fear of contracting a disease."[58] Courts have interpreted "rational basis" to mean "the clinically-demonstrable presence of a toxin in the plaintiffs body, or some other indication of a toxin-induced disease."[59]
In cases applying this standard, most plaintiffs are able to show that they were exposed to a disease-causing agent.[60] Most, however, are unable to withstand summary judgment because they fail to present sufficient evidence of the presence of a toxin in their bodies and therefore cannot establish a rational basis for their fears.[61] The stringent standard reflects the fact that "`the courts of this State . . . have been loathe to entertain claims for emotional damage flowing from the possibility of coming down with an illness or disease absent infection or clinical evidence of a related condition sufficient to provide *312 a rational, nonspeculative basis for the fear.'"[62]
C. Intentional Infliction of Emotional Distress
"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress."[63] The tort has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."[64] Courts have recognized that "reckless conduct is encompassed within the tort denominated intentional infliction of emotional distress," and allow claims when defendants disregard a substantial probability of causing severe emotional distress.[65]
Because this "broadly defined" tort does not proscribe any specific type of behavior, courts have limited the first element to include only conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."[66] Claims for intentional infliction of emotional distress typically fail because the conduct complained of is not sufficiently extreme or outrageous as a matter of law.[67] In addition, relief is limited because "a cause of action for intentional infliction of emotional distress should not be entertained where the conduct complained of falls well within the ambit of other traditional tort liability."[68]
*313 Unlike claims for fear of future injury due to toxic exposure asserted under a negligence theory, no special standard exists for toxic exposure claims asserted as intentional torts. In fact, a review of the New York case law reveals no discussion of claims for intentional or reckless infliction of emotional distress arising out of exposure to potentially toxic agents.
V. DISCUSSION
Defendants move for summary judgment on plaintiffs' claims for emotional distress, which they assert as part of their negligence claim and as a separate claim for intentional infliction of emotional distress. Whether plaintiffs raise a triable issue of fact must be evaluated for each claim, as each has different elements.
A. Negligent Infliction of Emotional Distress
Because plaintiffs' claim for negligent infliction of emotional distress arises out of exposure to a substance they fear may cause disease, the standard for toxic exposure cases applies. In order to withstand summary judgment under this standard, plaintiffs must present, first, evidence of their exposure to MTBE, and second, evidence of a physical manifestation of that exposure to guarantee that their fears have a rational basis.
1. Plaintiffs' Exposure to MTBE
Plaintiffs have provided sufficient evidence to allow a jury to find that they were exposed to MTBE through the well water they used in their homes for drinking, cooking, bathing and cleaning. Reports from environmental engineers hired by Sunoco and NYSDEC reveal high levels of MTBE contamination in many wells at various times from 2000 through 2002.[69] Further, the parties dispute the duration of the exposure before bottled water and water treatment systems were provided to homes where contamination was found.[70] Since there is no known date for an initial release of MTBE, the duration of plaintiffs' exposure to MTBE is a fact the jury must determine at trial.
2. Presence of MTBE in Plaintiffs' Bodies
A plaintiff must also establish a physical manifestation "of a toxin in the plaintiffs body, or some other indication of a toxin-induced disease," thereby showing there is some rational basis for her fear.[71] Defendants repeatedly point out that none of the plaintiffs have developed cancer or suffer from any medical conditions related to MTBE.[72] In doing so they further blur the already unclear distinctions between claims for physical injury and claims for emotional distress. Plaintiffs do not assert *314 that MTBE has caused them a compensable physical injury,[73] nor do they need to, as "physical injury is not a necessary component of a cause of action for negligent infliction of emotional distress."[74] To interpret the legal standard for fear of future illness claims as requiring plaintiffs to show they currently suffer from that very illness would render the standard unworkable.
Instead, plaintiffs must show, through clinical evidence, some physical manifestation of their exposure to MTBE.[75] The physical manifestation requirement arose in an emotional distress case where the plaintiffs exposure to asbestos was extremely limited.[76] In its analysis of the claim, the court examined asbestos exposure cases throughout the country and found that courts permitted recovery when the plaintiff showed "clinical presence of asbestos fibers in the lung," such as "pleural or parenchymal scarring," but denied it where "there is no clinical evidence of an asbestos-related condition."[77]
Substances other than asbestos may affect the body in ways that could similarly lead to illness, but often do not leave such easily identifiable markers of their presence. As the New York Supreme Court Appellate Division, Second Department has noted, "commonly in cases of this sort physical contamination cannot be demonstrated for decades, so that many causes of action to recover damages for `fear of [developing] cancer' based upon exposure to toxins with long incubation or latency periods will be subject to summary dismissal."[78]
Plaintiffs in these cases demonstrate the presence of MTBE in the body through the testimony of their expert Dr. Myron Mehlman, who explains that MTBE molecules, when ingested or inhaled, bind to the DNA strain to form adducts on the DNA.[79] In some cases, depending where on the DNA strain the adducts form, the presence of the adducts interferes with DNA replication, inducing mutations in newly-formed DNA.[80] These mutations can lead to errant cell production and eventually tumors.[81] According to Dr. Mehlman, based on data detailing the extent of plaintiffs' exposure to MTBE, plaintiffs "more probably than not experienced genetic or subcellular damage as a result of that exposure."[82]
There is no reason why MTBE-DNA adducts should not meet the physical manifestation requirement simply because they *315 are "subcellular."[83] Several courts have found subcellular damage sufficient to permit emotional distress claims to proceed to trial, under similar or more stringent standards requiring physical injury or harm.[84] The courts that have declined to recognize subcellular damage as an "injury" have done so in claims for physical injury rather than emotional distress, or emotional distress claims asserted in jurisdictions with more stringent legal standards than New York's.[85] As the United States District Court for the District of Minnesota stated in denying summary judgment on claims for increased risk of injury and emotional distress, "this Court cannot rule as a matter of law that plaintiffs' alleged injuries are not `real' simply because they are subcellular. The effect of volatile organic compounds on the body is a subtle, complex matter . . ."[86] Molecules bound to DNA are certainly "present" in the body. Further, assuming that the model of carcinogenesis Dr. Mehlman describes is valid, as I must for the purposes of summary judgment, the physical manifestation of MTBE in plaintiffs' bodies is not benign, but can be the first step in the development of the disease they claim to fear.
Defendants also argue that even if sub-cellular damage were sufficient to meet the standard, plaintiffs' failure to present clinical evidence of MTBE in their own DNA is fatal to their claim. Plaintiffs do not offer any individual evidence showing the presence of MTBE-DNA adducts on their own DNA; it is unclear from the submissions whether clinical testing could reveal adducts for a given individual. Further, Dr. Mehlman admits that he did not review the medical records of the plaintiffs nor "examine" them.[87] He also states, however, that it was not necessary as a matter of standard practice for him to examine the individual plaintiffs or their medical records to conclude they had experienced subcellular damage from ingesting and inhaling MTBE.[88] According to Dr. Mehlman's *316 expert report and deposition testimony, all plaintiffs have adducts on their DNA based on the amount of MTBE to which they were exposed.[89]
Testimony from experts regarding plaintiffs' subcellular damage has been sufficient evidence for plaintiffs to withstand summary judgment in other jurisdictions.[90] For the purposes of summary judgment, I must view the facts in the light most favorable to the non-moving party and draw all inferences in favor of that party.[91] Viewed in this manner, Dr. Mehlman's statement raises a genuine issue of material fact for trial. It is for the jury, not the court, to gauge the weight and credibility of Dr. Mehlman's testimony and determine whether MTBE adducts do in fact exist on plaintiffs' DNA, and whether plaintiffs' fear that it is likely they will cause cancer is reasonable.
Defendants rely heavily on a similar case in which a New York Supreme Court judge granted summary judgment to the defendants on plaintiffs' emotional distress claims.[92] In that case; at least sixty of the plaintiffs currently suffered from cancer, but did not seek damages for physical injury because they acknowledged they did not have sufficient evidence to show that exposure to MTBE had in fact caused their cancer.[93] The court found that without evidence establishing a causal link between their current illnesses and MTBE, their claims for emotional distress must also fail.[94]
The only evidence plaintiffs Offered in Atkins was an affidavit from Dr. Mehlman stating that "a possibility exists that exposure to the toxins may well be responsible for the cancers."[95] The court found this affidavit insufficient and noted the absence of medical records pertaining to the plaintiffs' illnessesillnesses that plaintiffs in these cases do not actually suffer. Plaintiffs did not offer evidence regarding MTBE-DNA adducts in Atkins as they have in the instant cases, and therefore the result in Atkins need not determine the result here.
In fact, there is precedent in New York for allowing emotional distress cases to withstand summary judgment even when the plaintiffs presented no evidence of the physical presence of contamination in their bodies.[96] Instead, plaintiffs presented expert testimony that they had each been exposed to contaminants from a landfill near their homes, and that, "to a reasonable degree of medical certainty . . . plaintiffs had a `likelihood' of contracting cancer as a result of their exposure."[97] The court reasoned that the expert testimony that plaintiffs had a likelihood of developing cancer provided a sufficient guarantee of the genuineness of the claims.[98]
*317 3. Likelihood That Plaintiffs Will Develop Disease
Although not a required element of an emotional distress claim, courts have also evaluated the likelihood that a plaintiffs exposure will eventually lead to disease when determining whether there is a rational basis for a plaintiffs fear.[99] Defendants argue that because no official scientific body has declared MTBE to be a human carcinogen, no reasonable juror could find that there is a rational basis for plaintiffs' fears of developing cancer.
As plaintiffs' expert states, only a few of the many forms of cancer are the causative factors known with any degree of certainty."[100] The lack of certainty regarding the effects of MTBE exposure should certainly be a factor for the jury when considering the reasonableness of plaintiffs' fears.
Plaintiffs offer evidence in support of the conclusion that MTBE can cause cancer. Dr. Mehlman's expert report lists several studies in which researchers found that MTBE exposure caused tumors in rats and mice, as well as many studies on adverse health effects of MTBE.[101] Dr. Mehlman states in his expert report that "some humans exposed to MTBE are more likely than not to suffer cancers as a result of that exposure. Therefore, it is my opinion that Plaintiffs who have been exposed to MTBE or other gasoline constituents through their domestic water supplies would be reasonable to have a fear of developing future disease including cancer."[102]
Based on this evidence, I cannot find as a matter of law that the likelihood that plaintiffs will develop disease is so low as to make their fears irrational. Plaintiffs have raised a genuine issue of material fact as to whether. MTBE causes cancer, and whether plaintiffs' fears of developing cancer are reasonable. The ultimate answer to these questions is for the jury to decide.
B. Intentional Infliction of Emotional Distress
The first issue to consider in a claim for intentional infliction of' emotional distress is whether the conduct at issue is so outrageous and extreme that it is "beyond all possible bounds of decency." The parties offer differing accounts of the conduct at issue. Defendants argue that in light of Sunoco's immediate and thorough response to the first detections of. MTBE at the station and the fact that ExxonMobil was not even considered a potentially responsible party for MTBE releases from the Fort Montgomery Mobil station, no reasonable juror could find their actions to be extreme or outrageous. Defendants' argument evades the real issue, however, since the conduct plaintiffs allege to be extreme and outrageous is not the defendants' responses to MTBE releases, but the fact that the companies marketed a product that they knew to have both possible *318 health risks and a proclivity to mix easily with groundwater.
Plaintiffs offer scant evidence to support their claim that defendants marketed gasoline containing MTBE despite their knowledge that MTBE posed serious risks to the public. First, plaintiffs offer a memorandum between Sunoco executives in the 1980's showing that executives were aware of "groundwater contamination and gasoline containing MTBE transport through soil," and proposed to develop data to "address spill or leak problems."[103] Second, they offer the deposition testimony of Exxon's former engineer, Barbara Mickelson, who testified that she warned management in 1984 that MTBE dissolved easily in groundwater and could increase contamination.[104]
Plaintiffs have presented no further evidence that would allow a reasonable juror to conclude that defendants' conduct was extreme and outrageous. Plaintiffs did not, for example, provide any evidence that defendants were aware of any adverse health effects of MTBE at the time they decided to market the product.[105] Nor did plaintiffs submit evidence suggesting defendants may have misled the public regarding the health risks of MTBE.
Viewed in the light most favorable to the plaintiffs, the evidence in the record shows that both defendant companies knew MTBE could contaminate groundwater but marketed it anyway. Assuming a reasonable juror could find this conduct extreme and outrageous, plaintiffs' claim nonetheless fails as a matter of law based on the second element of the tort. Plaintiffs have submitted no evidence that, when defendants knowingly marketed a product that could cause widespread property damage and environmental harm, they also intended to cause or disregarded a substantial probability of causing severe emotional distress to the plaintiffs.
Causing harm to property, without more, does not involve a substantial probability of severe emotional distress. In fact, a plaintiff may not recover damages in New York for mental distress caused as a result of damage to property.[106] The emotional distress plaintiffs allege depends on the release of a possible carcinogen, or at least a substance with some adverse health effects, into their drinking water. On the basis of the evidence in the record before the Court, a reasonable juror could not find that defendants acted in disregard of a substantial probability of causing emotional distress. Therefore, defendants' motion is granted as to plaintiffs' claims for intentional infliction of emotional distress.
VI. MOTION TO COMPEL MENTAL EXAMS
Because plaintiffs' claims for negligent infliction of emotional distress may proceed to trial, I must address one final matter. Before filing the instant motion, defendants requested that the Court order plaintiffs to submit to mental exams pursuant to Federal Rule of Civil Procedure 35. Under Rule 35(a), "when the mental or physical condition (including the blood group) of a party . . . is in controversy, the court in which the action is pending may *319 order the party to submit to a physical or mental examination . . ."[107] The order can be made only on "good cause shown," in contrast to other discovery productions that require only a showing of relevance.[108] In the leading case on Rule 35, the Supreme Court discussed the limitations of the "in controversy" and "good cause" requirements in detail, noting that "[m]ental and physical examinations are only to be ordered upon a discriminating application by the district judge of the limitations prescribed by the Rule."[109]
A "plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury."[110] Courts have distinguished, however, between emotional distress asserted as an element of damages for other claims such as physical injury or sexual harassment, and independent claims for emotional distress. "Most cases where mental examinations have been allowed have either involved a separate tort claim for emotional distress or an allegation of ongoing severe mental injury."[111] Where a plaintiff seeks "parasitic" damages for emotional distress, on the other hand, courts generally do not order a mental exam absent other factors such as particularly severe mental distress.[112]
Courts have also distinguished between "mental injury" as discussed by the Supreme Court and the more general term "emotional distress." In an often-cited California case, Turner v. Imperial Stores, the court concluded, "`emotional distress' is not synonymous with the term `mental injury'" and held that in order to establish that a party's mental condition is in controversy, the moving party "must show more than that the party in question has claimed emotional distress."[113] The court in Turner reviewed cases and found that mental condition was in controversy when the plaintiffs alleged mental disorders or psychiatric injuries, or had consulted psychologists in connection with the claimed emotional distress."[114] On the other hand, when plaintiffs' emotional distress was "garden variety," and no more than "that which is normally experienced by plaintiffs under [the] circumstances," courts did not order plaintiffs to submit to mental exams.[115]
Plaintiffs in these cases liken their mental suffering to the "garden variety" emotional distress that courts have determined does not place a plaintiffs mental state in controversy. Plaintiffs have not consulted mental health professionals regarding their concerns about developing cancer, *320 with the exception of one plaintiff who asked her physician about insomnia, and expert testimony on emotional distress is not required to prove their claims. They do not allege that they suffer from clinical mental injuries such as depression or post-traumatic stress disorder.
Nonetheless, plaintiffs do not seek damages for emotional distress merely as a side effect of their primary injury; instead, they assert an independent claim for emotional distress. Although plaintiffs' complaints do not specifically assert a separate cause of action for negligent infliction of emotional distress, both complaints seek "personal injury damages for and including but not limited to reckless and negligent infliction of emotional distress."[116] Because emotional distress is the only personal injury plaintiffs allege, the claims for relief for such injury cannot be categorized as "parasitic" damages. Courts will order a mental exam when emotional distress is an element of a plaintiffs claim, even when the plaintiff has stipulated that she will not support those claims with medical evidence.[117] Therefore, plaintiffs claiming emotional distress must submit to mental exams pursuant to Rule 35(a).
Rule 35(a) also requires that an order to compel mental exams "shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made."[118] The parties are directed to confer and agree on the time, place, manner, conditions, and scope of the examinations as well as the person designated to conduct them. If the parties cannot resolve disputes regarding these considerations, they shall so advise the Court in writing.
VII. CONCLUSION
For the foregoing reasons, defendants' motion is denied in part and granted in part. Plaintiffs are ordered to submit to mental exams regarding their claims for negligent infliction of emotional distress. The Clerk of the Court is directed to close this motion (docket # 1485).
SO ORDERED.
NOTES
[1] See Application for Methyl Tertiary Butyl Ether, Decision of the Administrator, 44 Fed. Reg. 12,242, 12,243 (Mar. 6, 1979).
[2] See 5/14/87 Interoffice Correspondence from W.H. Douthit to J.Q. Griffith, III, re "Trip ReportOxygenated Fuels Association (OFA) Meeting, Washington, D.C., and MTBE Committee Meeting, Houston, Texas," ("Trip Report") Ex. 16 to Declaration of Tracey L. O'Reilly in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Emotional Distress Claims ("O'Reilly Decl."); 1/13/00 Deposition of Barbara Mickelson, Former ExxonMobil Environmental Engineer ("Mickelson Dep.") at 32:2-25, Ex, 17 to O'Reilly Decl.
[3] See Trip Report; Mickelson Dep. at 32:2-25.
[4] See 3/2/07 Expert Report of Dr. Myron A. Mehlman ("Mehlman Rpt."), Ex. 7 to O'Reilly Decl. (listing studies).
[5] See 5/28/07 Expert Report of Janet E. Kester, Ph.D. ("Kester Rpt."), Ex. 12 to Amended Declaration of Daniel M. Krainin, Esq. In Support of Defendants' Motion for Summary Judgment on Plaintiffs' Emotional Distress Claims ("Krainin Decl.").
[6] See 8/16/00 Groundwater and Environmental Services, Inc. (GES) Supplemental Subsurface Investigation Report ("GES Report") at 4, Ex. 8 to O'Reilly Decl.
[7] See Defendants' Amended Rule 56.1 Statement in Support of Their Motion for Summary Judgment on Plaintiffs' Emotional Distress Claims ("Def. 56.1") ¶ 20; GES Report at 4.
[8] See GES Report at 3.
[9] See Def. 56.1 ¶ 19; see also Certificate of Underground Storage Tank System Testing, May 15, 2000, Ex. 5 to Krainin Decl.
[10] See Plaintiffs' Revised Local Rule 56.1 Statement in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment of Plaintiffs' Emotional Distress Claims ("PL 56.1") ¶ 18(plaintiffs' expert Marcel Moreau stated that there were multiple leaks from dispensers at the station during the 1990's).
[11] See Def. 56.1 ¶ 22; GES Report at 16(noting that most MTBE concentrations were within NYSDEC standards).
[12] See Def. 56.1 ¶ 21.
[13] 6/30/00 Letter from William Morse, Sunoco, to David Traver, NYSDEC, Ex. 8 to Krainin Decl.
[14] See 2/3/04 Letter from Keith Browne, NYSDEC Environmental Engineer to William Brochu, Sunoco, Ex. 9 to Krainin Decl.
[15] See Def. 56.1 ¶ 15.
[16] See id. 4.26; 9/8/06 Deposition Testimony of Leroy Favre at 80:6-8.
[17] See 8/02 Envirotrac Preliminary Investigation Report, Favre Mobil Service Station MTBE Impacted Groundwater in Fort Montgomery ("Envirotrac Report") at 1, Ex. C to Declaration of Jennifer Kalnins Temple in Support of Defendants' Reply in Support of Motion for Summary Judgment of Plaintiffs' Emotional Distress Claims ("Temple Decl."); 9/04 Envirotrac Update Report, Favre Mobil, Ex. 2 to O'Reilly Decl.
[18] See Def. 56.1 ¶ 27; 12/9/03 Letter from David Traver, NYSDEC to Plaintiffs' Counsel John Sarcone, Ex. 14 to Krainin Decl.
[19] 9/04 Envirotrac Update Report, Favre Mobil, Ex. 2 to O'Reilly Decl.
[20] See 11/8/06 Deposition of Michael Tobin, ExxonMobil, Ex. 13 to O'Reilly Decl.
[21] See GES Report at 4.
[22] See id. at 16.
[23] See 3/2/07 Expert Report of Stephen Whcatcraft, Ex. 11 to O'Reilly Decl. ("Wheatcraft Rpt.") (mapping MTBE levels at individual residences over time).
[24] See 6/30/00 Letter from William Morse to David Traver, NYSDEC, Ex. 8 to Krainin Decl.
[25] See Def. 56.1 ¶ 5-8.
[26] See Wheatcraft Rpt. at 40.
[27] See Def. 56.1 ¶ 6.
[28] See Def. 56.1 ¶ 8; 4/11/06 Deposition Testimony of Edwina D. Gee at 96:6-22, Ex. 6 to O'Reilly Decl.
[29] Def. 56.1 ¶ 12.
[30] See id. ¶ 4 n. 1 (citing deposition testimony of Sandra Bogardus (at 17, 56, 58); Donna Boyce (at 110-118); Anna Burley (at 120-125); Stacey Camacho (at 129-130); Chris Despirito (at 133-135); Tracie Despirito (at 110-112); Denise Gibney (at 212-213); Anna Hubney (at' 44-45, 58-59); and Cheryl Shrieve (at 92-98)).
[31] Fed.R.Civ.P. 56(c).
[32] Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir.2006) (quoting Stuart v. American Cyanamid Co., 158 F.3d 622, 626 (2d Cir.1998)).
[33] Bouboulis v. Transport Workers Union of Am., 442 F.3d 55, 59 (2d Cir.2006) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[34] Adickes v. S.H. Kress &. Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).
[35] McClellan, 439 F.3d at 144 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).
[36] Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir.2005) (quoting Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 428 (2d Cir.2001)).
[37] See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 456 (2d Cir.2007).
[38] Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir.2002) (citing Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir.2000)).
[39] Ferrara v. Galluchio, 5 N.Y.2d 16, 21, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958).
[40] Howell v. New York Post Co., 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993).
[41] See id.; see also Kennedy v. McKesson Co., 58 N.Y.2d 500, 462 N.Y.S.2d 421, 448 N.E.2d 1332 (1983) (discussing development of law governing negligent infliction of emotional distress).
[42] Daluise v. Sottile, 40 A.D.3d 801, 803, 837 N.Y.S.2d 175 (2d Dep't 2007).
[43] Jensen v. L.C. Whitford Co., 167 A.D.2d 826, 562 N.Y.S.2d 317 (4th Dep't 1990).
[44] Ferrara, 5 N.Y.2d at 21, 176 N.Y.S.2d 996, 152 N.E.2d 249("mental disturbance is easily simulated," but some "kinds of mental injury are marked by definite physical symptoms, which are capable of clear medical proof").
[45] Johnson v. State of New York, 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590 (1975),
[46] 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958).
[47] See id. at 18, 176 N.Y.S.2d 996, 152 N.E.2d 249.
[48] Id. at 18-19, 176 N.Y.S.2d 996, 152 N.E.2d 249.
[49] Id. at 21, 176 N.Y.S.2d 996, 152 N.E.2d 249 (quoting Prosser on Torts § 34, pp. 212-13).
[50] Id. at 21-22, 176 N.Y.S.2d 996, 152 N.E.2d 249.
[51] See Kennedy, 58 N.Y.2d at 504-05, 462 N.Y.S.2d 421, 448 N.E.2d 1332; Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir.2000).
[52] See Battalla v. State of New York, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961).
[53] See Johnson, 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590.
[54] See Lando v. State of New York, 39 N.Y.2d 803, 385 N.Y.S.2d 759, 351 N.E.2d 426 (1976).
[55] Kennedy, 58 N.Y.2d at 505, 462 N.Y.S.2d 421, 448 N.E.2d 1332.
[56] See Rittenhouse v. St. Regis Hotel Joint Venture, 149 Misc.2d 452, 455, 565 N.Y.S.2d 365 (Sup.Ct.N.Y.Co.1990), modified on other grounds, 180 A.D.2d 523, 579 N.Y.S.2d 100 (1st Dep't 1992) ("In view of the fact that asbestos was widely used and asbestos removal now common, fear of cancer without a physical indication of disease is not reasonable.").
[57] Patton v. General Signal Corp., 984 F.Supp. 666, 673-74 (W.D.N.Y.1997).
[58] DiStefano v. Nabisco, Inc., 2 A.D.3d 484, 485, 767 N.Y.S.2d 891 (2d Dep't 2003) (citing Prato v. Vigliotta, 253 A.D.2d 746, 748, 677 N.Y.S.2d 386 (2d Dep't 1998); Abusio v. Consolidated Edison Co. of N.Y., 238 A.D.2d 454, 454, 656 N.Y.S.2d 371 (2d Dep't 1997); Wolff v. A-One Oil, Inc., 216 A.D.2d 291, 292, 627 N.Y.S.2d 788 (2d Dep't 1995)).
[59] Id.
[60] But see Ordway v. County of Suffolk, 154 Misc.2d 269, 583 N.Y.S.2d 1014 (Sup.Ct. Suffolk Co.1992) (emotional distress claims of physician who operated on HIV-positive patient without knowing patient's HIV status dismissed because plaintiff failed to show that he was actually exposed to the disease); Hare v. State of New York, 143 Misc.2d 281, 539 N.Y.S.2d 1018 (Ct. Claims 1989) (emotional distress claims of hospital employee bitten by prison inmate too speculative when the only basis for fear was that nurse mentioned inmate might be suffering from AIDS but no proof of inmate's infection was offered).
[61] See, e.g., DiStefano, 2 A.D.3d at 484, 767 N.Y.S.2d 891 ("although the plaintiff established that the infant plaintiff was exposed to volatile organic compounds (hereinafter VOC), she presented neither clinical evidence of some physical manifestation of VOC contamination, nor evidentiary proof in admissible form sufficient to establish a triable issue of fact regarding some other indication of a toxin-induced disease"); Prato, 253 A.D.2d at 748-49, 677 N.Y.S.2d 386 (evidence of exposure to petroleum, but no evidence of "physical manifestation of petroleum contamination"); Abusio, 238 A.D.2d at 454, 656 N.Y.S.2d 371 (evidence of exposure to PCBs, but "no clinical evidence of PCB contamination"),
[62] In re MTBE Prods. Liab. Litig., 379 F.Supp.2d 348, 431 (quoting Tischler v. Dimenna, 160 Misc.2d 525, 533, 609 N.Y.S.2d 1002 (Sup.Ct. Westchester Co.1994) ("someone who has been exposed to HIV infection but has not come down with it has not suffered a physical injury for which a recovery in damages may be allowed")). Many recent cases have denied recovery to plaintiffs claiming a fear of developing HIV/AIDS because six months after exposure a plaintiff will test either positive or negative for the disease: Accord Sims v. Comprehensive Cmty. Dev. Corp., 40 A.D.3d 256, 835 N.Y.S.2d 163 (1st Dep't 2007) (vacating damages award for six months of distress, when claimant tested negative). In this sense, claims for fear of developing HIV/AIDS are not analogous to fear of disease due to toxic exposure.
[63] Howell, 81 N.Y.2d at 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (quoting Restatement (Second) of Torts § 46[1] (1965); citing Fischer v. Maloney, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978); Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); Freihofer v. Hearst Corp., 65 N.Y.2d 135, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985) for New York adoption of Restatement).
[64] Id.
[65] Dana v. Oak Park Marina, Inc., 230 A.D.2d 204, 209, 660 N.Y.S.2d 906 (4th Dept 1997).
[66] Murphy, 58 N.Y.2d at 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (quoting Restatement [Second] of Torts § 46, comment d).
[67] See, e.g., Deak v. Bach Farms, 34 A.D.3d 1212, 825 N.Y.S.2d 852 (4th Dep't 2006) (manager's order to exercise horse that had previously thrown other riders); Stauber v. New York City Transit Authority, 10 A.D.3d 280, 781 N.Y.S.2d 26 (1st Dep't 2004) (bus driver's rudeness and profanity toward wheel-chair-bound passenger); Kaiser v. Van Houten, 12 A.D.3d 1012, 785 N.Y.S.2d 569 (3d Dep't 2004) (attorney's failure to file papers on behalf of plaintiff in Article 78 proceeding); Lightman v. Flaum, 278 A.D.2d 373, 717 N.Y.S.2d 617, (2d Dep't 2000), aff'd but criticized, 97 N.Y.2d 128, 736 N.Y.S.2d 300, 761 N.E.2d 1027 (2001) (rabbi's disclosure of confidential information to plaintiff's husband later used against her in divorce proceeding); but see Dana, 230 A.D.2d 204, 660 N.Y.S.2d 906 (marina owners' installation of video camera in the women's bathroom, viewing of videotapes for personal purposes, and distribution of tapes to others could be found to be extreme and outrageous).
[68] Butler v. Delaware Otsego Corp., 203 A.D.2d 783, 784-85, 610 N.Y.S.2d 664 (3d Dep't 1994).
[69] See Wheatcraft Rpt.; GES Site Monitoring and Operation & Maintenance Report January through March 2007, Ex. 2 to Supplemental Declaration of Tracey L. O'Reilly in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment of Plaintiffs' Emotional Distress Claims ("O'Reilly Stipp. Decl.") (reporting levels of MTBE contamination in wells).
[70] Plaintiffs' expert, Marcel Moreau, concludes that there was a release "in excess of a hundred gallons" of gasoline! containing MTBE prior to 1988, and numerous leaks from the dispensing system between 1992 and 1996. Pl. 56.1 ¶ 40, see also 3/2/07 Expert Report of Marcel Moreau, Ex. 9 to O'Reilly Decl.
[71] DiStefano, 2 A.D.3d at 485, 767 N.Y.S.2d 891.
[72] See Defendants' Amended Memorandum of Law in Support of Their Motion for Summary Judgment on Plaintiffs' Emotional Distress Claims ("Def. Mem.") at 2 ("plaintiffs do not suffer from any MTBE-induced illness . . . or any related condition"); 6 (plaintiffs have not "offered any evidence that MTBE caused" their headaches or insomnia); 10 ("no evidence that any Plaintiff has any such illness").
[73] See Def. 56.1 ¶ 11 (with the exception of Ms. Buchholz).
[74] Jensen v. L.C. Whitford Co., 167 A.D.2d 826, 562 N.Y.S.2d 317 (4th Dep't 1990).
[75] See DiStefano, 2 A.D.3d at 485, 767 N.Y.S.2d 891.
[76] Rittenhouse, 149 Misc.2d at 454-55, 565 N.Y.S.2d 365 (plaintiff purchased furniture at a hotel over the course of several weeks while asbestos removal was taking place in the hotel).
[77] Id. (citing Herber v. Johns-Manville Corp., 785 F.2d 79 (3d Cir.1986); In re Hawaii Federal Asbestos Cases, 734 F.Supp., 1563 (D.Hawai'i 1990); Devlin v. Johns-Manville Corp., 202 N.J.Super. 556, 495 A.2d 495 (N.J.Super. Ct. Law Div.1985)).
[78] Wolff, 216 A.D.2d at 292, 627 N.Y.S.2d 788 (noting that plaintiffs can later sue for damages if the disease does develop).
[79] See 7/24/07 Deposition of Myron A. Mehlman, Ph.D. ("Mehlman Dep.") 234: 8-19.
[80] See generally Kathleen Dixon and E. Kopras, Genetic Alterations and DNA Repair in Human Carcinogenesis, 14 Seminars in Cancer Biology 6, 441-48 (Dec.2004).
[81] Mehlman Dep. 235:2-4 ("And this is what we believe [is] the present concept of carcinogenesis").
[82] See Mehlman Rpt. at 38.
[83] See Def. Mem. 12-13.
[84] See, e.g., Bryson v. Pillsbury Co., 573 N.W.2d 718, 720-21 (Minn.Ct.App.1998) (evidence of chromosome breakage was sufficient to raise issue of fact as to present injury requirement); Anderson v. W.R. Grace & Co., 628 F.Supp. 1219, 1226-27 (D.Mass.1986) (when requiring physical harm, the Massachusetts Supreme Court "did not distinguish between gross and subcellular harm. Instead, the court drew a line between harm which can be' proven to exist through expert medical testimony . . . and harm which is merely speculative or based solely on a plaintiff's unsupported assertions"); Brafford v. Susquehanna Corp., 586 F.Supp. 14, 17-18 (D.Colo.1984) (expert testimony that exposure to radiation had caused subcellular damage was sufficient evidence of present injury to withstand summary judgment' on claims for increased risk of disease).
[85] See Metro-North Commuter R.R. v. Buckley, 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) (plaintiff did not establish emotional distress claim because he failed to show that his exposure to asbestos was a "physical impact" as required under federal law); Rainer v. Union Carbide Corp., 402 F.3d 608 (6th Cir.2005) (subcellular damage was not "bodily injury" as required in suit for physical injury under Price-Anderson Act); Parker v. Brush Wellman, Inc., 420 F.Supp.2d 1355 (N.D.Ga.2006), aff'd in part, vacated in part on other grounds, 230 Fed.Appx. 878 (11th Cir.2007) (subcellular damage not compensable as a physical injury); In re Rezulin Prods. Liab. Litig., 361 F.Supp.2d 268 (S.D.N.Y.2005) (in emotional distress claims under Texas and Louisiana Law, subcellular damage was not a "manifest injury" nor a "special circumstance" as required by those states).
[86] Werlein v. United States, 746 F.Supp. 887, 901 (D.Minn.1990), vacated in part on other grounds, 793 F.Supp. 898 (D.Minn.1992) (expert testimony that plaintiffs suffered chromosome breakage created issue of fact as to whether plaintiffs had "present physical injury" as required by Minnesota law).
[87] Def. 56.1 ¶¶ 31-32.
[88] See Mehlman Dep. 275:13-277:18.
[89] See id. 228 ("All of them were physically damaged. The question is will that damage translate into something else.").
[90] See Bryson, 573 N.W.2d at 720-21; Werlein, 746 F.Supp. at 901; Brafford, 586 F.Supp. at 17-18.
[91] See Dom v. Sheet Metal Workers' Intl Assn., 498 F.3d 152, 155 (2d Cir.2007).
[92] See Atkins v. ExxonMobil Corp., No. 0175-2001, slip op. (Sup.Ct. Sullivan Co., Jan. 29, 2003), Ex. A to Def. Mem., aff'd in part, rev'd in part on other grounds, 9 A.D.3d 758, 780 N.Y.S.2d 666 (3d Dep't 2004).
[93] See id. at 6.
[94] See id. at 6-7.
[95] See id. at 6.
[96] See Dangler v. Town of Whitestown, 241 A.D.2d 290, 672 N.Y.S.2d 188 (4th Dep't 1998).
[97] See id. at 293, 672 N.Y.S.2d 188.
[98] See id. at 293-94, 672 N.Y.S.2d 188.
[99] See, e.g., id.; Doner v. Ed Adams Contracting, Inc., 208 A.D.2d 1072, 1073, 617 N.Y.S.2d 565 (3d Dep't 1994) (finding in favor of defendant on summary judgment because "no doctor has indicated that [plaintiff] is likely to develop asbestos-related impairment in the future"); Conway v. Brooklyn Union Gas Co., 189 A.D.2d 851, 852, 592 N.Y.S.2d 782 (2d Dep't 1993) (plaintiffs did not survive summary judgment as they offered no proof "that they had been advised by medical personnel of the likelihood of developing cancer").
[100] Mehlman Rpt. ¶ 14.
[101] Id. ¶ 27.
[102] Id. ¶ 29. At his deposition, Dr. Mehlman also testified that "most people probably will not sustain . . . the damage." Mehlman Dep. 256:10-16. It appears from the context that "the damage" refers to cancer.
[103] May 14, 1987 Interoffice Correspondence from W.H. Douthit to J.O. Griffith, III, re "Trip ReportOxygenated Fuels Association (OFA) Meeting, Washington, D.C., and MTBE Committee Meeting, Houston, Texas," Ex. 16 to O'Reilly Decl.
[104] Mickelson Dep. at 32:2-25.
[105] Most of the studies listed in Dr. Mehlman's report date from the late 1990's to 2005, and none predate the mid-1980 warnings that plaintiffs submitted.
[106] See Probst v. Cacoulidis, 295 A.D.2d 331, 743 N.Y.S.2d 509 (2d Dep't 2002).
[107] Fed.R.Civ.P. 35(a).
[108] Id.
[109] Schlagenhauf v. Holder, 379 U.S. 104, 121-22, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964).
[110] Id. at 119, 85 S.Ct. 234.
[111] O'Quinn v. New York Univ. Med. Ctr., 163 F.R.D. 226, 228 (S.D.N.Y.1995) (collecting cases).
[112] Id.
[113] 161 F.R.D. 89, 97 (S.D.Cal.1995).
[114] See id. at 93-95 (discussing Peters v. Nelson, 153 F.R.D. 635 (N.D.Iowa 1994) (plaintiff sued stepgrandfather in tort alleging sexual abuse); Shepherd v. American Broad. Co., 151 F.R.D. 194 (D.D.C.1993) (plaintiff's doctor, in deposition, diagnosed her with Post-Traumatic Stress Disorder); Tomlin v. Holecek, 150 F.R.D. 628, 629 (D.Minn.1993) (plaintiff attacked by union sympathizers had been treated by two psychologists for "severe and permanent emotional injuries"); Lowe v. Philadelphia Newspapers, Inc., 101 F.R.D. 296 (E.D.Pa.1983) (plaintiff required psychiatric care to treat emotional distress)).
[115] Id. at 93, 95-97.
[116] Complaint, Tonneson, et al. v. Sunoco, Inc. et al, ¶ 54; Complaint, Basso, et al. v. Sunoco, Inc., et al., ¶ 53.
[117] See Gattegno v. Pricewaterhousecoopers, LLP, 204 F.R.D. 228, 232 (D.Conn.2001).
[118] Fed.R.Civ.P. 35(a).